CHARLES J. HOFFMAN v. PEERLESS WHITE LIME COMPANY, Appellant.
— 296 S. W. 764.

Division One, May 24, 1927.

1. MASTER AND SERVANT: Safe Place: Continuous Duty. It is the positive duty of the master to use ordinary care to furnish his servant a reasonably safe place in which to work, and the duty is a continuous one, and the servant may assume that the master has performed the duty; but in determining what is a reasonably safe place, regard should be had, not only to the character of the work, but to the ordinary hazards of the employment.

2. ———: ———: Inspection. It is not only the duty of the master to use ordinary care to furnish his servant a reasonably safe place in which to do his work, but he must also, by inspection from time to time, and by the use of ordinary care and diligence, keep the servant's place of work in a reasonably safe condition; and a master who omits such duty to inspect cannot be pronounced free of negligence.

3. ———: ———: Quarry: Failure to Inspect. The mere falling of a rock from the bluff of a quarry is not sufficient to establish the master's negligence, nor is the master liable for failure to inspect unless the testimony tends to show that, if a proper inspection had been made, the dangers from the falling rock which afterwards caused the injury would have been discovered. But where there is evidence tending to show that loose rock had been projecting out of the face of the perpendicular bluff, from fifteen to thirty feet about the base at which the servant was required to work, for several days, and probably for two months, before it suddenly fell, and that the identical rock, four feet long and two and a half feet thick, which struck the servant, was seen hanging from the bluff on the day before it fell, and the evidence further tends to show that the master made no inspection for several days before it fell, the question whether, if the master had made an inspection of the bluff before putting the servant at work at the base of the bluff, he would have discovered the loosened condition of the rock, in time, by the exercise of ordinary care, to have avoided the injury, is one for the jury reasonably and fairly to infer from such evidence.

4. ———: ———: ———: Inspection: Ordinary Care. Where men are ordered to work at the base of a high perpendicular bluff, from which rock is being quarried by a lime company, ordinary care requires the company to make a reasonable inspection to discover loose rock projecting from the face of the bluff, high up above the base, whether loosened by blasting or freezing or other causes, and to remove such rocks in order to avert injury to such employees; and where the company neglects such reasonable inspection, and the loose rock falls and injures a shoveler at the base, who knows nothing of the loose condition of the rock or the impending danger, and is in the exercise of ordinary care, such neglected duty is the proximate cause of the injury.

5. NEGLIGENCE: Accident. An accident is an occurrence to which human fault does not contribute, or an unusual and unexpected event happening without negligence; and it cannot be held that the plaintiff's injury was the result of a mere accident, where there is substantial evidence from which it may reasonably be inferred that it resulted from defendant's negligence as its proximate cause.

6. ———: Assumption of Risk. The servant assumes the ordinary and usual risks incident to his employment, but never a risk which is the out-

growth or result of the master's negligence. The only risks which the servant assumes are those which remain after the master has exercised ordinary care. Nor can the master contract against his own negligence.

7. ———: **Contributory: Obvious, Danger.** Unless the danger occasioned by the master's negligence is so glaring and obvious to the servant as to threaten immediate danger, he cannot be held to be guilty of contributory negligence as a matter of law. Where the plaintiff testifies that he looked to see if there was danger and saw none; that he did not know that there was danger of any kind, and other witnesses testify to the same effect, it cannot be held as a matter of law that he was aware of the danger and persisted to work in spite of his knowledge that it was obvious until he was hurt, although other witnesses testify that danger was obvious and had been observed by them for a few days before the casualty; but the question is one for the jury.

8. **CONFLICTING TESTIMONY: Plaintiff's Own Witnesses.** A plaintiff is not conclusively bound by the adverse testimony of some of his own witnesses, when there is other testimony to the contrary, or where there are other facts and circumstances from which the jury may draw a contrary inference.

9. **NEGLIGENCE: Evidence of Prior Danger.** Testimony that several workmen quit work at the place of plaintiff's injury three days prior thereto upon the order of the foreman that the place was dangerous is admissible for the purpose of showing that defendant had knowledge of the dangerous condition.

10. ———: **Instruction: Matter of Inducement.** A phrase at the outset of an instruction telling the jury that if they find defendant was quarrying rock and used blasting to obtain it and "as a result of said blasting and work said bluff became dangerous" is to be regarded as mere matter of inducement where the basic negligence charged is, as hypothesized by the rest of the instruction, that defendant failed to exercise ordinary care to inspect the bluff to discover loose rocks projecting therefrom and to remove them before they fell upon the workman at the base of the bluff.

11. ———: ———: **Permitting Loose Rock.** To criticise the word "permitting" in an instruction where the allegation is that "defendant failed to remove, or cause to be removed, the loose rock" and the instruction tells the jury that if they find that the "injuries were the direct result of the negligence of defendant in permitting said loose rock to be and remain on the bluff," etc., is to make a distinction without a difference.

12. ———: ———: **Contributory: Obvious Danger.** An instruction telling the jury that "if you shall find that plaintiff might have reasonably supposed that he could safely work about said bluff, by the use of care and caution, and that he did use such care" he was not guilty of such contributory negligence as bars a recovery, states a true and correct test of ordinary care.

13. **EXCESSIVE VERDICT: $12,000: Common Laborer.** The plaintiff was a common laborer in defendant's quarry; a heavy rock, weighing a ton, fell fifteen to thirty feet from the side of a bluff, and rolled upon his hips and legs; he sustained multiple fractures of both pelvic bones, and a separation of the pubic bones; his left arm was broken, and he suffered severe and painful lacerations and abrasions; for four months he was confined in a hospital; the surgeon who attended him expressed the opinion that there will be a permanent union of the bones, but a slight discrepancy in walking; at the trial, twenty-one months after the injury, he still suffered pain, could not stand upon his feet or walk without the aid of crutches, and

was unable to arise from a chair without assistance; the jury had opportunity to observe his physical condition, and assessed his damages at $12,000, and the verdict was approved by the trial judge over an objection that the amount was excessive. **Held,** that this court will not disturb the verdict or judgment.

Corpus Juris-Cyc. References: **Accident,** 1 C. J., Section 5, p. 392, n. 32. **Damages,** 17 C. J., section 408, p. 1091, n. 85. **Evidence,** 23 C. J., Section 1793, p. 50, n. 59. **Master and Servant,** 39 C. J., Section 441, p. 308, n. 13; p. 312, n. 14; p. 313, n. 16; Section 534, p. 415, n. 15; Section 541, p. 425; n. 64; Section 896, p. 692, n. 6; Section 908, p. 705, n. 21; Section 1201, p. 980, n. 14; Section 1231, p. 1016, n. 80; Section 1313, p. 1117, n. 69; Section 1340, p. 1153, n. 95; Section 1363, p. 1183, n. 87; Section 1373, p. 1194, n. 35; Section 1384, p. 1203, n. 69; Section 1402, p. 1220, n. 71; Section 1403, p. 1222, n. 87; Section 1426, p. 1246, n. 72. **Negligence,** 29 Cyc., p. 622, n. 96.

Appeal from Ste. Genevieve Circuit Court.—*Hon. Peter H. Huck,* Judge.

AFFIRMED.

*Edward Robb* for appellant.

(1)   The court erred in refusing to give an instruction in the nature of a demurrer to the evidence, offered by defendant, both at the close of the evidence on the part of plaintiff and at the close of all the evidence, because: (a)   The injury which plaintiff suffered was the result of an accident, and the plaintiff in accepting the employment in which he was engaged assumed all the risks incident to such employment. Patrum v. Railroad, 259 Mo. 125; Young v. Mo. Pac. Ry. 93 Mo. App. 275; Powers v. Loose-Wiles Co., 192 S. W. 1045; Gwin v. Hydro Power Co., 195 S. W. 504; Thomas v. Railroad, 109 Mo. 199; Price v. Railroad, 77 Mo. 508; Lucy v. Oil Co., 129 Mo. 32; Bradley v. Railway Co., 138 Mo. 303; Fugler v. Bothe, 117 Mo. 475; Nugent v. Milling Co., 131 Mo. 241; Alcorn v. Ry. Co., 108 Mo. 97. (b)   The evidence failed to show that the injury suffered by plaintiff was due to any negligence on part of defendant. Smith v. Railroad, 37 Mo. 287; Sherwood v. Const. Co., 183 S. W. 687; Wojtylak v. Coal Co., 188 Mo. 278; Rowden v. Daniell, 151 Mo. App. 25; Eudy v. Federal Lead Co., 220 S. W. 504; Breen v. Cooperage Co., 50 Mo. App. 203; Bennett v. Equipment Co., 214 S. W. 244; Nugent v. Milling Co., 131 Mo. 252. (c)   The injury suffered by plaintiff was due to his own negligence. Patrum v. Railroad, 259 Mo. 121; Glassock v. Dry Goods Co., 106 Mo. App. 657. (2)   The court erred in giving Instruction A. (a)   Because it submits facts not alleged and not in issue and at variance with the petition. (b) Because it eliminates from the facts required to be found, the charge in the petition that the rock which fell became loose as a result of blasting. (c)   Because it allows the jury to find for plaintiff, if he was hit by any of the smaller rock when all the testimony showed it was the large rock which injured him. (d)   Because, said instruc-

tion assumed as facts contested issues, namely, that defendant had knowledge that there were loose rock in the bluff. Ganey v. Kansas City, 259 Mo. 654; LaFever v. Pryor, 190 S. W. 644; Reel v. Consolidated Inv. Co., 236 S. W. 43; Lukaminai v. American Steel Co., 162 Mo. App. 631; Linn v. Bridge Co., 78 Mo. App. 111. (3) The court erred in giving Instruction C. Said instruction submits that if the jury find that the plaintiff "might have reasonably supposed that he could safely work about said bluff, by the use of care and caution, and that he did use such care" then he was not guilty of contributory negligence.

*Jerry B. Burks* for respondent.

(1) The servant never assumes the risk of dangers due to negligence of his master. The evidence shows that the bluff where defendant placed plaintiff to work, and where he was injured, was dangerous on account of loose rock falling promiscuously, therefrom, and defendant had known this fact for some time, yet took no steps to trim the bluff or even warn plaintiff of its exceptionally dangerous condition. This was negligence, pure and simple on part of defendant. Williams v. Pryor, 272 Mo. 613; Knight v. American Mfg. Co., 264 S. W. 91; Charlton v. Railway, 200 Mo. 433; Fish v. Railway, 263 Mo. 124; George v. Railway, 225 Mo. 407. (2) Neither was plaintiff guilty of any contributory negligence that would defeat recovery. He was ordered to his place of work. He did not know that rocks were and had been loose and falling, promiscuously. He did not know that this bluff where he was placed had been condemned and that the men had been previously taken away for that reason. He had the right, in the absence of knowledge to the contrary, to assume that defendant had discharged its duty to keep the place as reasonably safe for work as the character of the work would permit. George v. Railway, 225 Mo. 364; Littig v. Heating Co., 292 Mo. 242; Bradley v. Coal Co., 167 Mo. App. 182. Moreover no duty of inspection was imposed by defendant on plaintiff, and he cannot be charged with negligence for failing to inspect. Littig v. Heating Co., 292 Mo. 242. (3) In determining whether a demurrer offered at the close of the evidence should have been sustained, the court will give the evidence the most favorable consideration of which it is capable in favor of plaintiff, all testimony supporting plaintiff's case and every reasonable inference therefrom being taken as true. Albrecht v. Belting Co., 252 S. W. 402; Maginis v. Railway, 268 Mo. 675; Buesching v. Gas Light Co., 73 Mo. 230; Troll v. Drayage Co., 254 Mo. 338; Scherer v. Bryant, 273 Mo. 602; Jordan v. Connecting Ry., 271 S. W. 998. (4) Instruction C given for plaintiff was correct, and has been

approved by this court time and again. Omelia v. Railway, 115 Mo. 218; Soeder v. Railway, 100 Mo. 681; Huhn v. Mo. Pac. Ry., 92 Mo. 447; Adams v. Harvesting Co., 95 Mo. App. 119; Harff v. Green, 168 Mo. 314; George v. Railway, 225 Mo. at 412. (5) The criticism of Instruction A, to the effect that it is broader than the petition and evidence, is hypercritical and without merit. Drilling is "work;" blasting is "work." The second objection is equally captious. If defendant negligently failed to remove the rocks it certainly permitted them to remain. (6) The mere fact that there was evidence by plaintiff's witnesses that the large rock which fell appeared loose and dangerous and anyone ought to be able to see it, and therefore in conflict with plaintiff's testimony that he did not discover the danger, is not conclusive against his right to recover, there being evidence of other witnesses that they did not know that this particular rock was loose. Ullom v. Griffith, 263 S. W. 879; Gilman v. Fleming, 265 S. W. 106; McGee v. Wabash Ry., 214 Mo. 530. (7) Question of negligence is ordinarily a jury question. This is especially true where an inference of negligence arises, or reasonable minds may differ. Troll v. Drayage Co., 254 Mo. 338; Jewell v. Bolt & Nut Co., 231 Mo. 199. (8) The verdict was not excessive. McCracken v. Swift .& Co., 265 S. W. 93.

SEDDON, C.—Action to recover damages for personal injuries sustained by plaintiff and alleged to have been caused by defendant's negligence. Plaintiff was employed as a common laborer in defendant's quarry near the city of Ste. Genevieve, and, at the time of his injury, was engaged in shoveling spawls, or small rocks, from the floor at the bottom of the quarry into a small tram car, which was used in transporting the broken rock to defendant's lime kilns nearby. The suit was originally instituted against two corporate defendants as joint tortfeasors, but, prior to the trial, dismissal was made as to one of the defendants, leaving the appellant herein, Peerless White Lime Company, as the sole defendant.

The petition charges defendant with negligence in the following respects:

"That on and prior to the 5th day of January, 1922, defendants in the process of quarrying at the place aforesaid, had opened up a large quarry, and to obtain the rock and stone therefrom, from time to time did drill into a perpendicular bluff or wall of rock, seventy-five feet or more in height, at said quarry, and did then blast or shoot down said rock by means of powerful explosives.

"Plaintiff further states that on the said 5th day of January, 1922, he was in the employ of defendants and as such employee was engaged in the work of breaking and shoveling rock so shot down at the quarry aforesaid of defendants, as was his duty in the premises,

and as he was ordered and directed so to do by defendants and their agents in charge of said quarry; that while plaintiff was so working on said date at said quarry and near the foot of said bluff, and while engaged in the performance of his duty as a shoveler and employee of defendants, and while acting in the course and scope of his employment, a large rock and many smaller rocks which had become and remained loose and dangerous in and on said bluff, as a result of the blasting aforesaid, fell from said bluff of rock down and upon plaintiff; that, as a direct result of said rocks falling upon and striking plaintiff," he sustained certain specified injuries.

"Plaintiff states that his injuries aforesaid were occasioned by and are the direct result of the negligence of the defendants, their agents and servants, (1) in that they failed to use ordinary care to provide for plaintiff a reasonably safe place to work, (2) negligently failed to inspect, or cause to be inspected, said bluff or wall of rock for the purpose of ascertaining and discovering the loose rocks aforesaid in said bluff, and (3) negligently failed to remove, or cause to be removed, the loose rocks in said bluff which fell from said bluff upon plaintiff or warn plaintiff of said loose rock.

"Plaintiff avers and charges the fact to be that defendants well knew that the bluff or wall of rock at and near where plaintiff worked had and contained loose and dangerous rock and knew that said rocks were liable at any time to fall and injure plaintiff and his co-employees while in the discharge of their duties, or by the exercise of ordinary care could have known all said facts in time to have warned plaintiff and in time to have removed the loose rock from said bluff and in time to have made said bluff and quarry reasonably safe for use and thereby prevented injury to plaintiff."

The answer consists of a general denial, with pleas of assumption of risk and contributory negligence. The reply is a general denial.

Plaintiff was injured between 4:30 and five o'clock on the afternoon of January 5, 1922, by several rocks which fell upon him from the perpendicular face of the quarry bluff at the foot of which he was working. Defendant's quarry extends in an easterly-and-westerly direction in the shape of a horseshoe or crescent, and was variously estimated by the witnesses as from 350 to 600 feet, or more, in length. The face of the quarry was estimated by the witnesses as extending perpendicularly some 60 to 75 feet in height above the surface of the ground in front and at the base of the quarry, with the exception that, at the bottom of the quarry face, there was what the witnesses describe as the "toe" of the bluff, consisting of a slope extending outwardly and downward from a point a few feet upward on the perpendicular face of the bluff to a point on the floor of the quarry about 12 feet outwardly from the perpendicular face. The quarry had been in operation for some fifteen years, and the rock used in

defendant's business was shot down, or broken off the bluff, by blasting. At or near the west end of the quarry was a tunnel, which had been made into the face of the bluff. In shooting down the rock from the main bluff, or face of the quarry, well-drills were used in making holes in the bluff, the holes were then loaded with powder or dynamite, and several holes were fired simultaneously, thereby causing large rocks to be thrown downward to the foot of the bluff, where they were broken up into smaller rock and loaded into small wheeled boxes, or cars, to be conveyed over a track to the lime kilns. In removing rock from the tunnel, jack-hammers were used in drilling the holes, and smaller blasts were used than those used in the removal of the rock from the main bluff.

Plaintiff began his work for defendant on January 4, 1922, and had worked during the whole of that day and most of the following day, until about 4:30 in the afternoon, when he was injured. He had previously worked for defendant in the same quarry somewhat intermittently, and at different times, for about three years. The evidence is uncontradicted that he was ordered, or directed, by defendant's foreman to work at the particular place where he was injured, which was about the middle of the perpendicular face of the bluff and some 12 or 15 feet distant therefrom, at which place he was shoveling spawls, or small broken rocks, into the tram car, pursuant to the directions of the foreman. While so working, a number of small rocks and a very large rock fell, without warning, from the face of the perpendicular bluff immediately above the place where plaintiff was working. One of the small rocks struck plaintiff upon the face, throwing him backward, and, as he was falling, the large rock struck the "toe" of the bluff, and rolled or slid over the "toe" upon the body and lower limbs of plaintiff, pinning him beneath the rock. The large rock was described as being about four feet in length and about 2½ feet thick, and as weighing approximately a ton. The place in the face of the bluff from which the large rock fell was estimated by the witnesses at from 15 to 30 feet from the bottom, and about 30 to 45 feet from the top, of the perpendicular bluff. It required the combined effort of several fellow workmen to lift the heavy rock off plaintiff. Plaintiff was severely injured. He suffered lacerations of the head and face; his left arm was broken; both pelvic bones sustained comminuted, or multiple, fractures; there was a separation of the pubic bones, and his back, hips and thighs were lacerated and contused.

The evidence tends to show that defendant, or its representatives, had made no inspection of the bluff for several days, at least, prior to plaintiff's injury. Plaintiff testified: "Q. State whether or not, during the two days you were there, the defendant had anyone examining that bluff or testing it to see if there was any loose rock

up there? A. They never had anybody that I knowed of. Q. They had no inspector that you know of? A. No, sir." Plaintiff's witness Flieg, testified: "Q. Now, at the time you went over there to work at the place where he [plaintiff] got hurt, state whether or not the defendant had anyone going around and examining that bluff to see whether there was any loose rock there? A. No, sir. Q. Had you seen them do that while you worked there? A. Well, no, not as long as I had worked there. I only started on the 2nd— I had only worked there two days. Q. Up to that time, you had not seen them do that? No, sir. . . . Q. Now, Mr. Burks asked you whether there was anybody around there inspecting that and looking at it—you don't know anything about that, do you? A. I never did see anybody inspecting the bluff or I never seen anybody before this accident scaling the bluff." Plaintiff's witness, Richard Rayoun, testified: "Q. When did you quit work there, if you did quit? A. Second of January, 1922. . . . Q. Up to the time you quit there, state to the jury whether or not the defendant had anyone taking down loose rocks in that bluff and inspecting it to see if there were any loose rocks in it? A. They did not. They had no inspector or taken any rocks down at all." Defendant's witness, Dallas, testified on cross-examination: "Q. Did the company have anyone go up there and examine those rocks? A. No, sir. Q. Or take them down, or notify you people, anything of the kind? A. No, sir, not at that time." Defendant offered no evidence tending to show that it had inspected the bluff, or scaled the face of the bluff of loose rocks, at any time prior to plaintiff's injury.

Several witnesses testified as to the condition and appearance of the perpendicular face of the bluff at, and for some days prior to, the time of plaintiff's injury. Plaintiff's witness, Roth, testified: "Q. State to the jury whether or not you had worked at this place where he [plaintiff] got hurt? A. I worked there one day. Q. When was that? A. That was the day before he went to work. I worked there the 4th of January and he started the 5th, I think— no, I started the 3rd of January and he started the 4th, I think. . . . Q. State to the jury whether or not you noticed as to where that rock came from after it fell. Did you look to see where it came from? A. No, I didn't look, but I seen the rock hanging there when I worked there. Q. You mean the day before? A. Yes, sir; the day before that, before he got hurt. Q. You say you saw a rock hanging there—you mean projecting? A. I seen the same rock that fell on the man. Q. About how high was that rock you saw? A. I would judge about twenty feet from the bottom. Q. Could you tell by looking at it whether it was loose or not? A. No, sir; I couldn't tell. . . . Q. You looked at this rock particularly the day before it fell, did you, or rather the day you were working

there? You know it was the same rock? A. I know it was the same rock. Q. And you say you couldn't tell whether there was any danger of it falling or not? A. Couldn't tell at all. Q. Could anybody tell whether there was any danger of it falling? A. I never heard anybody say so.''

Plaintiff's witness, Basler, after testifying that he quit the employment of defendant at noon on January 2, 1922, testified further: ''Q. At the time you quit, that bluff or wall of rock all around there, how did that come to be there? A. Why, it come from big shots, from shooting the rock down. It never was scaled off; they never did see a man scale a rock off that bluff. . . . Q. Did you hear the testimony of the witnesses as to the place where Mr. Hoffman got hurt? A. Yes, sir. Q. Were you familiar with the bluff at that place? A. Yes. Q. Will you tell the jury the appearance of the bluff there? A. Well, it was just a part of the bluff there, and it was dangerous for anybody to work there. Q. Why do you say it was dangerous? A. Because there was loose (rock) hanging on the bluff. Q. Why did you folks work there? A. We didn't work there. Q. Why didn't you? A. We quit there, we got orders—Mr. Rayoun give us orders not to work there. Q. Why did he give you orders not to work there? A. Because it was dangerous there. Q. What is Mr. Rayoun's first name? A. Joseph Rayoun. He was foreman over the men in the quarry. . . . Q. Now, Mr. Basler, in answer to Mr. Burks, you said you were ordered to quit work there on account of—A. Because of there being loose rock up there. . . . Q. How long had these rocks been projecting out, that you speak of, so anybody could see them? A. Probably a couple of months, some of them. Q. And anybody could see them? A. Yes, sir. Q. And you thought they were liable to fall? A. Certainly. Q. And anybody could see them? A. Yes. There was nobody there to take them rocks off.''

Richard Rayoun testified: ''Q. Now, you heard the witnesses testify as to where Charley Hoffman got hurt, did you not? A. Yes, sir. Q. Are you familiar with that bluff? A. Yes, I worked there until I got orders to quit work there. Q. Why were you told not to work there? A. Well, the bluff was dangerous. Q. What made it dangerous? A. Well, it was caused from the shooting—loose rock. Q. The shooting would have what effect on the rock? A. What hanging rocks there was, it would shake them loose. The bluff never was scaled down. When they would put off a big shot, it would loosen some rocks and it was just left that way, and when shooting was done at other places, it would shake these rocks off. . . . Q. At the time you were working there and at the time you quit, who was the foreman there? A. Joe Rayoun, my brother.

Q. As foreman, did he have charge of the men working there? A. Yes, sir. Q. Do you know whether or not he knew rocks were liable to fall from this place A. Yes. He moved us out from that place. . . . Q. I understood you to say you quit work on the 2nd day of January, 1922? A. Yes. Q. Prior to that, how long had you been working there? A. Well, I had been there about a year and a half. . . . Q. Well, did you notice any rocks projecting out of the bluff? A. Yes, sir. Q. What kind of rocks were they? A. Well, the rocks were dangerous. Q. At what point in the bluff were they? A. Right where this man got hurt. Q. Could you see them? A. Yes, sir. Q. Did you know they were dangerous? A. Yes, sir. . . . Q. How high up on the bluff were these rocks projecting out? A. Well, those bad rocks stuck out all the way up the bluff. Q. How far were they sticking out? A. I don't know how far they were sticking out, but they were hanging, hanging out. Q. What were they hanging to? A. They were just hanging in the bluff, barely hanging there.''·

Respecting his knowledge and appreciation of the danger of rocks falling from the face of the bluff, plaintiff testified as follows: ''Q. Now, while you were working there, did you have occasion to notice the rocks above you where you were working? · A. Why, I've looked up there. I never noticed any loose rocks or anything. Q. I mean, from your observation, looking at that bluff—I understand you to say that you didn't know that the rock which fell was loose? A. No, sir, I didn't know it was loose. . . . Q. I say, did this rock fall off from the top of the bluff? A. I don't know exactly where it came from. Q. If there had been any rock up there such as this was, you could have seen it, couldn't you? A. Well, I don't know. . . . Q. Did you notice anything around there? A. Why, I noticed everything I could notice. I thought it was safe and everything. . . . Q. What I want to get at is this, did that rock fall out of the bluff or did it fall from the top of the bluff? A. Well, I couldn't tell you, because I never seen the rock at all before I got hit. Q. Did you notice any rocks on the side of the bluff when you went to work there? A. I noticed those that were shot down that I was working at. Q. Oh, I don't mean that. I mean rocks in the bluff. Did you notice any rocks in the bluff? A. Why, no. Q. None at all? What was in that bluff if it wasn't rocks? A. It was one solid rock. Q. One solid rock? A. Yes, sir; that's the way it looked to me. . . . Q. It was just a straight bluff where this rock was? A. Yes, sir. . . . Q. Now, when you went there, to the place where you say you were injured, did you take the precaution to look to see whether everything was safe, whether there were any rocks likely to fall either from the top or side of the bluff? You didn't look to see if there was anything of that kind,

did you? A. I looked, but I never knowed there was any danger of any kind. Q. You looked to see, did you? A. I looked to see whether there was anything. Q. That's the point. I want to know, first, did you look to see whether there was any indication of danger around there? A. Why, sure, I looked to see if there was any danger. If there had been any danger, I wouldn't have worked there. Q. You didn't see any danger, did you? A. No, sir. Q. And when you looked, where were you standing with reference to the bluff, that is, this perpendicular bluff? A. I was standing just where I was working. Q. Within twelve feet of it. You looked up and down and you looked on top as far as you could see, and you didn't see any indications of danger at all, did you? A. No, sir. . . . Q. If there had been any indications of danger, anything on that bluff or in the bluff, about the rocks or dirt or anything, anything to indicate danger, there wasn't anything to prevent you from seeing it, was there? A. Oh, I could see the bluff, if that is what you mean. Q. There wasn't anything to prevent you seeing the bluff and all the surroundings there? A. Wasn't anything to prevent me seeing the bluff, no. Q. Was there anything to prevent you from seeing if there was any projecting rock in the bluff that was liable to fall? A. I never seen anything that looked like it was liable to fall. . . . Q. And you didn't observe anything wrong? A. I never thought that there was anything wrong at all. · Q. And you looked to see if there was anything wrong? A. If I had knowed there had been anything, I wouldn't have worked there. . . . Q. Was that bluff exactly smooth, or did it have rough places in it and rocks projecting out, or was it a smooth face bluff? A. Oh, it wasn't exactly smooth, but everything looked safe to me. Q. You mean to say that it wasn't a perfectly smooth surface? · A. No, sir, it wasn't what you'd call smooth. Q. At places the rocks would jut out? A. Yes, sir. Q. And at places it was smooth? A. Yes, sir. Q. Mr. Robb asked you whether you looked at the bluff. State to the jury whether you were always looking out when you were working in a place of that kind? A. Yes, sir, I was always careful and looking to see how everything was. . . . Q. Was it a part of your duty to go around and inspect the bluff? A. No, sir. Q. Or to test it, use anything to see if the rock was loose? A. No, sir. Q. Did you ever have any instructions to that effect? A. No, sir, never did. . . . Q. If other people who were working there and had been working there previous to that time, a day or so previous, could see there were overhanging rocks there apparently in a dangerous condition and liable to fall, if they could see that, I say, was there anything to prevent you from seeing it? A. I never seen any. Q. And I believe you stated yesterday, you looked to see? A. Why, I looked, but then I never seen any. Q. You never saw any? A. No, sir."

Several · of plaintiff's witnesses, who were working ·near plaintiff at the time he was injured, testified that the bluff did not appear to them to be dangerous, nor did they think that rocks were likely to fall therefrom. Other witnesses of plaintiff, upon cross-examination, testified that the projecting rocks in the bluff were plainly obvious and appeared to them to be dangerous, and that anyone working at the foot of the bluff could have seen that the rocks were dangerous and likely to fall from the bluff. Defendant's foreman, Schmelze, who had directed plaintiff to work at the place where he was injured, testified on behalf of defendant: "Q. Did you notice anything unusual in the condition of that wall or bluff at that time? A. What ·do you mean by that? Q. I mean, did you notice any · indications that the rock might fall? A. Well, I didn't think it would fall. Q. You saw the rock wall that day, did you? A. I saw the bluff. Q. Did you see anything there to lead you to believe that the· rock might fall that day? A. No, sir. Q. You didn't see anything? A. I didn't think it would fall or I would have told them to get away. Q. Certainly. If you had thought there was any danger, you would have told them to get away? A. Yes, I think I would. . . . Q. Now, you stated if you had known there was any likelihood of danger there that day, you wouldn't have had them work there? A. Yes, sir. Q. You wouldn't have had them work there? A. Why, no. . . . Q. Was there anything there that anybody could have observed that this rock was likely to fall? A. There was some higher up— Q. I mean, where this particular rock came out of the bluff? A. No, I don't think. There was ·some further up. Q. Those higher up, could they have had any effect or caused this lower down rock to fall? A. No, sir. . . . Q. Was there any part of this quarry where it was considered dangerous at that time? A. Well, I think it is dangerous everywhere. Q. By that, what do you mean? You mean, just the ordinary dangers incident to any quarry? A. Yes. Q. You think there is always more or less danger in a quarry? A. Yes, sir."

Several witnesses, on being asked what caused the rock to fall, answered that they did not know. Defendant offered some evidence to ·the effect that the rock *might* have been caused to fall from the bluff because of .percolating water freezing and thawing in the crevices· of the rock bluff. Several witnesses testified that there had been no blasting done in the quarry on the day of plaintiff's injury, or for several days prior thereto. Defendant's foreman, Schmelze, who was also the "powder man," testified: "Q. Had there been any blasting around there that day? A. Well, there might have been some little blasting, but no heavy blasting. If there was any, I think it might have been up in the tunnel, or maybe just some boulders. Q. How far away had it been? A. It might have been right close or it might

317 Mo.—7.

have been in the tunnel,—I don't remember. Q. You don't remember whether there was any blasting being done that day? A. No, I don't know whether there was any going on that day or not.''

Defendant, at the close of plaintiff's evidence and again at the close of all the evidence, requested the giving of peremptory instructions in the nature of demurrers to the evidence, both of which peremptory instructions were refused by the trial court. The case was submitted to the jury upon instructions given at request of the respective parties, resulting in a unanimous verdict for plaintiff, assessing his damages in the sum of $12,000, and judgment was entered thereon. Timely motions for a new trial and in arrest of judgment were filed by defendant and overruled by the trial court, whereupon defendant was allowed an appeal to this court.

I. Appellant assigns error in the refusal of its peremptory instruction in the nature of a demurrer to the evidence. It is appellant's contention that the evidence fails to show that plaintiff's injury was due to any negligence of appellant, but that the injury which plaintiff suffered was the result of a mere accident, for which appellant is in no wise legally responsible. It is also contended that plaintiff, in accepting employment as a shoveler and breaker of rock in defendant's quarry, assumed and took upon himself all the risks ordinarily incident to such employment, among which was the risk or danger of rocks falling from the exposed face of the quarry bluff; and, furthermore, that the evidence shows that plaintiff was guilty of contributory negligence as a matter of law.

This court, as well as the courts of other jurisdictions, has many times announced the well established and unquestioned law that it is the positive duty of the master to use ordinary care to furnish his

**Safe Place.** servant with a reasonably safe place wherein to work. So often has this duty of the master been declared that citation of authorities should be unnecessary. The duty thus imposed by the law upon the master is a continuing one, and, in the performance thereof, it is essential that regard should be had not only to the character of the work to be performed, but also to the ordinary hazards of the employment, and the servant may assume that the master has performed such duty. [39 C. J. 311, 312.] Not only is it the duty of the master to use ordinary care to furnish his servant with a reasonably safe place in which to work, but he must also, by inspection from time to time, and by the use of ordinary care and diligence, keep the servant's place of work in a reasonably

**Inspection.** safe condition. [39 C. J. 415.] Labatt on Master and Servant (2 Ed.) vol. 3, p. 2799, sec. 1059, announces the following rule, which is supported by ample juristic authority: ''That a master cannot, in the majority of instances, be pronounced free

from negligence, as a matter of law, where the instrumentality which caused the injury had never been inspected at all before the accident, or not at the time when it should have been, is obviously a necessary consequence of assuming that inspection is one of the duties which he owes to his servants. Usually, therefore, the case is for the jury wherever the evidence tends to show such omission to inspect.''

In the instant case, plaintiff's proof tends to show that the appellant made no reasonable or proper inspection of the face of the quarry bluff prior to plaintiff's injury. Appellant offered no evidence tending to show that it had made, or caused to be made, at any time any inspection of the quarry bluff, being apparently content to rest upon the assumption that the evidence fails to show that the rock which injured plaintiff fell from the bluff because it was loose, or that appellant knew that the rock was loose and liable to fall. It is true, as announced by this court in Wojtylak v. Coal Co., 188 Mo. l. c. 278, that the mere falling of a rock is not of itself sufficient to establish negligence on the part of the master; and it is likewise good law that "the master is not liable for failure to inspect, unless the testimony tends to show that, if a proper inspection had been made, the defect which afterwards caused the injury would have been discovered,'' as announced in Rowden v. Daniell, 151 Mo. App. l. c. 26. But plaintiff's evidence went farther than the mere showing that the rock which caused his injury fell from the face of the bluff, for several of plaintiff's witnesses testified that loose rocks had been projecting out of the face of the bluff for several days prior to the casualty in question. One witness testified that some of these rocks had been projecting out of the bluff for "probably a couple of months'' before plaintiff's injury, and another witness testified that the identical rock which fell and caused plaintiff's injury was seen by him "hanging'' from the bluff on the day before plaintiff was injured. We think that the jury, as triers of the facts, might reasonably and properly draw the inference, from all the evidence herein, that, had defendant, or its foreman, made an inspection of the bluff before putting plaintiff to work at the fot of the bluff, it would, or could, have discovered the loosened condition of the rocks which fell and injured plaintiff, in time, by the exercise of ordinary care, to have removed said rocks and thereby have prevented injury to plaintiff. We are of the opinion that plaintiff's evidence sufficiently established the negligence charged, for "negligence, like any ultimate fact in issue, may be established as well by reasonable inferences from other facts as by more direct means of proof.'' [Blanton v. Dold, 109 Mo. l. c. 75.]

In Scott v. Smelting Co., 187 Mo. App. 344, 355, wherein plaintiff was directed to work as a shoveler in the drift of a mine and was injured by a rock which fell from the roof of the drift, FARRINGTON,

J., speaking for the Springfield Court of Appeals, said: "It is a matter of common knowledge that in caverns of this kind where shots are being fired and where the roof is of such height that workmen cannot ascertain for themselves whether they are working in an obviously dangerous place, proper inspection should be made and trimming or brushing from time to time as needed to make it a reasonably safe place. It was fairly inferable that the negligence of the defendant in failing to inspect and trim or brush the roof at reasonable intervals was the proximate cause of plaintiff's injury. [Deweese v. Meramec Iron Mining Co., 54 Mo. App. l. c. 478-482; Id., 128 Mo. 423, 31 S. W. 110.] The jury could fairly infer that an ordinary inspection of the roof would have revealed the loose condition of the rock in time to have prevented it falling on the plaintiff. Upon the showing made plaintiff was entitled to have the jury decide the facts."

In Medley v. Mining & Manufacturing Co., 207 S. W. 887, 889, plaintiff's intestate was engaged in shoveling loose clay into a wagon from a small pile upon the ground, near the face or side of a large bank of fire clay, when a corner of the latter fell over upon him without warning, crushing and instantly killing him. It appeared from the evidence that a crack, or cracks, at the top of the bank usually preceded a fall of clay therefrom and that such cracks were usually regarded as danger signals. It also appeared that defendant's foreman usually went upon the bank at the beginning of work on the morning of each working day in order to look for cracks and to see that everything was safe, but that, on the morning of deceased's injury, the foreman forgot to go upon the bank to make the inspection. In sustaining the action of the trial court in overruling a demurrer to the evidence, the Court of Appeals said: "In the first place, we may say that plaintiff's evidence makes it appear that Medley (deceased) had no supervision or control over the work and was charged with no duty to inspect for cracks or other appearances of danger, though it is said that all of the men kept, to some extent, a lookout for danger, as would be natural. . . . But it does not appear that Medley, when killed, was engaged in picking or shoveling clay from this large embankment which fell upon him. He was in fact standing near the embankment, shoveling loose clay from the ground into his wagon. The dangerous position which he occupied near this corner of the clay bank had been specifically assigned to him by Stack (the foreman). He was told by Stack to shovel at that very place, while Stack himself took a position farther from the dangerous embankment. . . . Indeed, if plaintiff's evidence is to be believed, a case of actionable negligence on defendant's part is clearly made out, we think, since it appears that defendant's vice-principal ordered Medley into a position which he (the vice-principal) knew,

or ought to have known, was dangerous, without any warning to Medley, and without taking any precautions whatsoever for his safety, and by such order held him in this dangerous place until death overtook him.''

In Illinois Steel Company v. Schymanowski, 162 Ill. 447, 455, the appellant company maintained on its premises a large pile of iron ore, several hundred feet long and about 75 feet high, from which pile the ore was shot down by dynamite. Plaintiff, pursuant to the directions of the company's foreman, was engaged in loading the broken ore at the bottom of the large pile into a vehicle to be taken to the furnace, when, without warning, a large piece of ore, about eight feet long and three feet thick, and weighing several tons, fell from the perpendicular face of the pile of ore and injured plaintiff. Error was assigned in the refusal of a peremptory instruction to find for defendant. Said that court, in ruling the peremptory instruction to have been rightly refused: ''Unquestionably, it was the duty of the appellant company, when, through its foreman, or superintendent, or boss, it ordered appellee to work near or alongside of the pile of ore, to see to it that the pile was safe. Appellee had nothing to do with the construction of the pile, or with the loosening of its material by means of explosives. He knew nothing about its condition. A foreman, in charge of workmen and clothed with the power of superintendence, is bound to take proper precautions for the safety of the men at work under him. Where he puts men at work alongside of such a pile of ore as has been herein described, which must be shattered by dynamite in order to loosen its component parts, it is his duty to observe carefully the condition of its material as to looseness or compactness, and all other features of its structure, so that he may be enabled to determine what should be done to prevent such injuries as those inflicted upon appellee. The jury might well have believed that, if he had exercised proper skill and foresight, the accident would not have happened. Whether or not appellee was in the exercise of ordinary care was a question of fact for the jury. It was no part of his duty to study the conditions affecting the stability of the ore at the sides of the pile, or to do anything except to work as well as he could under the directions of the foreman or boss. [Hennessey v. City of Boston, 161 Mass. 502.]''

In Black's Admr. v. Cement Co., 106 Va. 121, 133, plaintiff's intestate was a ''powder man'' in defendant's rock quarry and was directed by the foreman to go under a ledge of rock and do some blasting. The evidence disclosed that, from where the deceased was working, there was no apparent danger from the ledge of rock above. The foreman testified that he did not inspect the ledge of rock, supposing that it was not dangerous or liable to fall. A large rock fell from the ledge and killed the workman. In ruling defendant's ap-

peal from an adverse judgment, that court said:· "The gravamen of the declaration is that it was the duty of the defendant company to keep and maintain its quarry in a reasonably safe condition and that it neglected this duty. The defendant company protesting its ignorance of the basic fact alleged in the declaration, the plaintiff might have proved, if he could, directly, that the defendant company had knowledge of this fact, and if it could not be so proved there was but one other way to prove it, and that was by proving that, by the exercise of reasonable or ordinary care, it could have known it. Inspection is but a means to an end, and we think that it was entirely admissible under the declaration charging the neglect of the admitted duty of the defendant company to keep its quarry in a reasonably safe condition, the neglect of which duty was the proximate cause of Black's death, to prove that the defendant company could have ascertained the danger to which he was subjected by regularly inspecting its quarry and clearing away dangerous stones therefrom, as it had theretofore done, but had abandoned, leaving that duty upon Hunter, its walking boss, alone, and which duty he confessedly neglected. There was no way by which the defendant company could continuously keep its quarry in a reasonably safe condition without looking and seeing whether or not it was safe—without employing some person or persons to do this work of inspection. . . . It was for the jury to say whether or not the defendant company could have, by the exercise of reasonable or ordinary care, known of the danger to which Black was subjected at the time and place when and where he met his death, and to find, if it could have known of the danger by such care, that then it knew of the danger. It was for the jury to determine whether or not the negligence of the defendant company was the proximate cause of Black's death, and whether or not he was guilty of contributory negligence."

We cannot agree with the appellant that plaintiff's injury was the result of a mere accident. Strictly speaking, an accident is an occurrence to which human fault does not contribute, and is sometimes

**Accident.** defined as an unusual and unexpected event happening without negligence. [1 C. J. 392.] Our own court has jurisdically defined the word "accident," in Zeis v. Brewing Assn., 205 Mo. l. c. 651, thus: "If after considering all the evidence in the case, offered by both plaintiff and defendant, and there is no evidence found of negligence, which resulted in the injury, then the injury is said to be the result of an accident. An accident is the happening of an event proceeding from an unknown cause." It cannot be well said, we think, in view of the testimony adduced herein and the reasonable inferences to be drawn therefrom, that there is no evidence whatever of negligence resulting in plaintiff's injury. Consequently, plaintiff's injury was not the result of a mere accident.

Neither was plaintiff's injury, upon the record herein, the result of a risk which he assumed as a matter of law. The doctrine of assumed risk rests upon contract, express or implied, between the master and the servant, whereby the servant agrees to assume the risk of those dangers which are usual and incident to his employment. But, while the servant is said to assume the ordinary and usual risks incident to his employment, it is the thoroughly established rule in this State that the servant never assumes a risk which is the outgrowth, or result, of the master's negligence. [Fish v. Railway Co., 263 Mo. 106; Charlton v. Railroad Co., 200 Mo. 413; Williams v. Pryor, 272 Mo. 613.] The reason of the foregoing rule is that it is against public policy for a master to contract against his own negligence. As aptly and pointedly said by Judge FARIS, speaking for this court, in Patrum v. Railroad Co., 259 Mo. l. c. 121: "The moment negligence comes in at the door it may well be said that the doctrine of assumption of risk goes out at the window." Therefore, it is well settled, at least in this State, that "the risks assumed by the servant are those risks alone which remain after the master has exercised ordinary care." [Charlton v. Railroad Co., 200 Mo. l. c. 433.] As we have said herein, ordinary care required of the defendant master the making of a reasonable inspection of the quarry bluff in order to discover the existence of loose rocks, whether loosened by the blasting operations or by weathering or other causes, and the removal of such rocks in order that injury to its employees might be averted. Under such circumstances, it cannot be said that plaintiff assumed the risk of injury from the falling rocks. This is not a case where the plaintiff servant was engaged in work that, in its progress, necessarily and constantly changed the condition of his place of work, or where the very work in which he was engaged created the danger as the work progressed; nor was he engaged, at the time of his injury, in making an unsafe place safe. So far as the record before us shows, plaintiff had nothing whatsoever to do with altering the perpendicular face of the bluff or in blasting and removing the rocks therefrom. His work and employment, as shown by the record, consisted solely of breaking up the rocks which were on the floor at the base of the bluff, and in shoveling the small, broken rocks into the tram-car.

**Assumption of Risk.**

Nor can we say that the evidence herein conclusively shows that plaintiff was guilty of contributory negligence as a matter of law. It is well settled in this State that, unless the danger occasioned by the master's negligence is so glaring and obvious to the servant as to threaten immediate injury, the servant cannot be held to be guilty of contributory negligence as a matter of law. [Jewell v. Bolt & Nut. Co., 231 Mo. 176; Wendler v. People's House Furnishing Co., 165 Mo. 527; Littig v. Heating Co., 292 Mo.

**Danger. Obvious**

226; Edmondson v. Hotels Statler Co., 306 Mo. 216.]   It has been held that, where it is shown that the servant had knowledge of the danger, such knowledge precludes a recovery only when the danger is so obvious that a man of ordinary prudence, under the circumstances, would have refused to do the master's bidding.  [Wendler v. House Furnishing Co., 165 Mo. 527; McDonald v. Construction Co., 196 Mo. App. 57.]   Plaintiff testified that, although he looked to see if there was any danger, he saw no indication of danger; that he did not know "there was any danger of any kind;" and that, if he had been aware of any danger, he would not have worked in the place where he was injured.   Several fellow-workmen likewise testified that, from their positions on the floor of the quarry, they could not tell that the rock which fell and injured plaintiff was loose, and they saw no indications of danger therefrom.   Their testimony in this respect is corroborated, to some extent, at least, by defendant's foreman and vice-principal, Schmelze, who testified that, while he saw the bluff on the day of the casualty, he did not see anything to lead him to believe that the rock might fall that day; that he didn't think it would fall or he would have told the workmen to get away from the bluff. While it is true that some of plaintiff's witnesses testified, on cross-examination, that the large rock which fell appeared to be loose and dangerous, and that anyone should have been able to see its dangerous condition, their testimony was in conflict with that of plaintiff and other witnesses.   It was the province of the jury to settle that conflict between plaintiff's witnesses; furthermore, the plaintiff is not conclusively bound by the adverse testimony of some of his witnesses when there is other testimony to the contrary, or where there are other facts and circumstances in the case from which the jury may draw a contrary inference.  [McGee v. Railroad Co., 214 Mo. 530; Ullom v. Griffith, 263 S. W. 876; Gilman v. Fleming, 265 S. W. 104.] Considering the evidence as a whole, we think that it sufficiently appears therefrom that the danger was not so obvious and patent as to threaten immediate injury to plaintiff, or that a reasonably careful and prudent man, in the position of plaintiff, would not have encountered it.   Under such facts, the plaintiff cannot be held to be contributorily negligent as a matter of law, so as to bar a recovery.  [Gambino v. Coal & Coke Co., 180 Mo. App. 643; Barnard v. Brick & Coal Co., 189 Mo. App. 417; McDonald v. Construction Co., 196 Mo. App. 57; Medley v. Mining & Manufacturing Co., 207 S. W. 887.]

In our opinion, whether defendant was negligent in the respects charged in the petition, and whether plaintiff was himself guilty of negligence contributing to his injury, were questions of fact properly determinable by the jury, and therefore the trial court rightly refused defendant's peremptory instruction in the nature of a demurrer to the evidence.

II. Appellant assigns error in the admission of the testimony of certain witnesses to the effect that several workmen quit work at the foot of the quarry bluff on January 2, 1922, three days prior to plain-

**Prior Danger.** tiff's injury, upon the order of defendant's foreman, Joseph Rayoun, because the bluff was dangerous. We think that such testimony was properly admissible for the purpose of showing that the defendant had knowledge of the defective and dangerous condition of the bluff prior to plaintiff's injury. [Garard v. Coal & Coke Co., 207 Mo. 242.] But aside from this reason, we do not regard the testimony complained of as so prejudicial in effect as to constitute reversible error.

III. Appellant contends that error was committed in the giving of Instructions A and C on behalf, and at the request, of plaintiff. Instruction A is as follows: "The court instructs the jury, that if

**Instructions.** you shall find and believe from the evidence in this cause that, on the 5th day of January, 1922, and prior thereto, defendant was engaged in quarrying rock from a bluff at its plant near the city of Ste. Genevieve, and that to obtain said rock, did from time to time drill into said bluff and shoot and blast down said rock by means of explosives; and shall further find that, as a result of said blasting and work, said bluff became and was dangerous or unsafe by reason of rocks being or becoming loose in said bluff and liable to fall and injure its employees working at or near the base or bottom of said bluff; and if you shall further find that plaintiff was, on

**Inducement.** the 5th day of January, aforesaid, an employee of defendant and working, as a shoveler, at and near the base of said bluff, and that while so working loose rocks aforesaid fell from the bluff aforesaid at and near where plaintiff was working, and struck and injured plaintiff in and about his head, face, arm, back and hips, and shall further find that said injuries were the direct result of the negligence, if any, of defendant in permitting said loose rocks, if any, to be and remain in said bluff; and if you shall further find that defendant knew that said bluff was dangerous or unsafe and contained loose rock which was liable to fall and injure plaintiff, or by the exercise of ordinary care, could have known said facts in time, by the exercise of said degree of care, to have removed said rocks and thereby have prevented injury to plaintiff, then your verdict should be for plaintiff, if you further find that he was at the time exercising ordinary care for his own safety." It is said that the part of the instruction which authorized and required the jury to find that, "as a result of said blasting and *work*, said bluff became and was dangerous or unsafe by reason of rocks being or becoming loose in said bluff and liable to fall and injure its employees working at or near the base or bottom of said bluff," submitted to the jury a

fact which was not pleaded and was not in issue, viz., that the bluff became dangerous or unsafe as a result of *work* done in the quarry, in addition to blasting. It is also urged that the instruction authorized the jury to find for plaintiff if the rocks which caused his injury had become loose and fell from any cause, whereas the petition alleges that the rocks became loose and dangerous "as a result of the blasting." The allegations of the petition with respect to the blasting of rock constituted mere matter of inducement. The gravamen of the petition and the basic negligence charged therein was not that the rocks became loosened and dangerous because of the blasting done, but that defendant failed to inspect the bluff, or cause the same to be inspected, for the purpose of discovering loose rocks in the bluff, and failed to remove such loose rocks from the bluff after it knew, or could have known by the exercise of ordinary care, that the bluff contained loose rocks which were liable to fall and injure plaintiff and his fellow-workmen, and therein failed to use ordinary care to provide for plaintiff a reasonably safe place in which to work. Hence, it was not necessary to support a recovery that the instruction should submit the fact that the rocks were loosened by blasting or by any other cause, so long as the instruction submitted to the jury the basic negligence charged in the petition, which, in our judgment, it clearly did. It is claimed that the instruction is also erroneous in that it submits to the jury the negligence of defendant in *permitting* loose rock to be and remain in the bluff, whereas the specific act of negligence charged in the petition is that defendant *"failed to remove, or cause to be removed,* the loose rock." We regard this criticism of the instruction as "a distinction without a difference." Neither do we think that, in the use of the word "permitting," the instruction assumes that defendant had knowledge of the fact that there were loose rocks in the bluff. On the contrary, the instruction required the jury to find, as a fact, that defendant knew, or by the exercise of ordinary care could have known, that "said bluff was dangerous or unsafe and contained loose rock." The instruction A was within the purview of both the pleadings and the evidence, and we find no error in the giving of the same.

Instruction C is as follows: "The court further instructs the jury, that even though you should find from the evidence that the work in which plaintiff was engaged was attended with dangers, on account of rock being liable to become loose and fall at and

**Ordinary Care.** near where he was working, and that this was known or could have been known to plaintiff, by the exercise of ordinary care, still if you shall further find that such danger was not so apparent and threatening as to deter a reasonably prudent person from engaging in said work at the time and place of plaintiff's injury; *or if you shall find that he might have reasonably supposed*

*that he could safely work about said bluff, by the use of care and caution, and. that he did use such care,* then and in that event it cannot be said.he was guilty of such contributory negligence as to defeat a recovery in this cause.'' It is claimed that the italicised clause of the instruction is not the true, or correct, test of ordinary care. An instruction couched in practically identical language was approved by this court in O'Mellia v. Railroad Co., 115 Mo. 205, l. c. 212, 218, and held to be proper under prior decisions of this court, cited therein.

IV.  Lastly, it is urged that the amount of the verdict is excessive. The record strongly indicates that plaintiff was grievously injured. The heavy rock, weighing a ton, fell or rolled upon his hips and lower limbs. · He sustained comminuted, or multiple, fractures

**Excessive.
Verdict.** of both pelvic bones, and there was a separation of the pubic bones. His left arm was fractured and he suffered severe and painful lacerations and abrasions. According to the tes·timony of the local physician who attended him, plaintiff suffered intensely from pain and from shock. On the day following his injury, ·he was ·taken to the .Mullanphy Hospital in St. Louis for surgical examination and treatment. He remained as a patient in the hospital until May 12, 1922, a period of over four months. The surgeon who attended plaintiff. at the hospital expressed the opinion that, while there should be a permanent recovery of the union of the bones, there will be some slight discrepancy in walking. At the date of the trial, October 23, 1923, one year and nine months after his injury, plaintiff testified that he still suffered pain; that he could not stand upon his feet or walk without the aid of crutches; and that he was unable to arise from a chair without assistance. The jury had the opportunity of observing his. physical condition at the trial, as did the trial judge, who permitted the verdict for $12,000 to stand without ordering a *remittitur,* although one of the grounds of defendant's motion for new trial was that the verdict is excessive and unreasonable. We are constrained to defer to the findings and conclusions of the jury and the trial-court respecting the amount of the damages, and to allow the verdict and judgment thereon to stand undisturbed.

Finding no reversible error in the record, the judgment *nisi* must be affirmed, and it is so ordered. *Lindsay, C.,* concurs; *Ellison, C.,* not sitting.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur, except *Gantt, J.,* not sitting. ·